# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHRISTOPHER GOODVINE,

        Plaintiff,

    v.                                         Case No. 16-C-890

BRETT VANDEWALLE, et al.,

        Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO SANCTION

Plaintiff Christopher Goodvine, an inmate serving a state sentence at Green Bay Correctional Institution (GBCI), brought this pro se civil rights action pursuant to 42 U.S.C. § 1983 against the warden, the security director, and various correctional officers and staff, alleging that they had violated the Eighth Amendment prohibition of cruel and unusual punishment by their deliberate indifference to his stated intent to harm himself. Goodvine alleges in his complaint that he is seriously mentally ill and has been diagnosed with uncontrollable urges to engage in cutting. ECF No. 1 at 2. He further alleges that after he was placed on "observation status" or "suicide watch" on May 24, 2016, because of his "suicidal gestures/ideations," staff failed to monitor him and he attempted suicide and seriously injured himself. The defendants are alleged to have then "acted to conceal their deliberate indifference by destroying official documents." The complaint alleges that the defendants compounded their violation of Goodvine's constitutional rights by denying him medical attention for his injuries and placing him in painful eight-point restraints. *Id.*

Goodvine filed his action on July 8, 2016, and paid the full filing fee on August 8, 2016. On September 20, 2016, Judge Clevert, to whom the case was originally assigned, entered a screening order pursuant to 28 U.S.C. § 1915A(a), which dismissed the warden and supervisory personnel with no direct involvement but allowed the case to proceed against the psychologist, correctional officers and health services staff that Goodvine alleged were directly involved. ECF No. 12. On March 27, 2017, the case was reassigned to Judge Pepper, and then reassigned to me on October 2, 2017. On January 3, 2018, I held an evidentiary hearing on the defendants' motion for sanctions against Goodvine for filing a false and fraudulent declaration in an attempt to defraud the defendants and the court. ECF No. 71. As explained more fully below, based on the evidence presented, I find by clear and convincing evidence that Goodvine filed a false and fraudulent declaration and then lied about it under oath, and will grant the defendants' motion. But before discussing the evidence presented at the hearing, it will be helpful to set forth the background and procedural history of the case to provide the context in which the specific issue before the court arose.

## BACKGROUND

The sworn declaration that is the subject of the defendants' motion was purportedly signed by GBCI Correctional Officer Davee McClinton on July 4, 2016. The declaration begins: "Pursuant to 28 U.S.C. § 1746, I , Officer McClinton, swear the following is true and correct, as dictated by myself and written by Christopher Goodvine, on 6/6/16 and again on 7/4/16." ECF No. 3. It then states that McClinton was assigned to monitor Goodvine after he was placed on observation status at GBCI on May 24, 2016. ECF No. 3. It states that even though Dr. Forbes, the psychologist who ordered Goodvine's placement in observation, and Captain Brett VandeWalle, the supervisor of the observation unit, told McClinton that Goodvine was on "'DIRECT' / 'ONE-ON-ONE' OBS,"

meaning McClinton was to remain directly outside Goodvine's cell and watch him constantly, McClinton was given other assignments which made constant supervision of Goodvine impossible. *Id.* The declaration further states McClinton told VandeWalle that Goodvine asked to be placed in a restraint chair because he was feeling suicidal and even showed McClinton a small cut on his finger. Later that morning, Goodvine seriously injured himself by cutting his arm. According to the declaration, when McClinton then told VandWalle he had been unable to monitor Goodvine "100%" of the time, VandeWalle and Dr. Forbes told McClinton to "'redo the paperwork' and this time log only '15-minute checks.'" *Id.* When McClinton saw the new "'Obs Log,' it said nothing about 'DIRECT OBS' and instead mentioned only Goodvine's placement in OBS." *Id.* The declaration states that McClinton first brought this to Goodvine's attention on June 6, 2016, and signed a statement then, which Goodvine stated he sent home. At the bottom of the declaration is the notation "dictated and witnessed/signed by," beneath which appears McClinton's signature followed by a slash and further writing that is scratched out. *Id.*

The defendants contend that Goodvine tricked Officer McClinton into signing a blank piece of paper on which he later wrote the entire contents of the July 4, 2016 declaration, which he then filed along with his complaint on July 8, 2016. The declaration was accompanied by a motion to seal it and for a protective order to prevent the defendants from searching Goodvine or his possessions for copies and directing them to preserve all evidence related to the May 24, 2016 incident. ECF No. 2. Filings accompanied by a motion to seal automatically remain under seal until the court rules on the motion. Judge Clevert denied the motion to seal in his order screening the case pursuant to 28 U.S.C. § 1915A, but because of a clerical error, the declaration was not unsealed until an attorney recruited by Judge Clevert to assist Goodvine in mediating the claim referred to it in a conversation

3

with the attorneys for the defendants. As a result, the defendants did not receive a copy of the declaration until almost a year after the case was filed. In any event, shortly after receiving the alleged declaration purportedly signed by McClinton, the defendants cancelled the mediation and on July 24, 2017, filed their motion requesting the court to exercise its inherent power to dismiss the action with prejudice and assess a strike against Goodvine pursuant to 28 U.S.C. § 1915(g) as a sanction for filing a false and fraudulent declaration with the court. ECF Nos. 70, 71, 73.

Goodvine raised a series of procedural objections to the defendants' motion and persisted in claiming that McClinton had told him what he wrote in the declaration and signed it thereafter. In the meantime, Goodvine had also filed a motion for a preliminary injunction on June 2, 2017, asking the court to order the defendants to transfer him to another facility on the grounds that the defendants and other GBCI personnel had been retaliating against him by, among other things, encouraging him to attempt suicide and injure himself, intercepting and destroying his mail, and denying him treatment for his mental condition. ECF No. 67. The June 2, 2017 motion was similar to a previous motion Goodvine had filed in the case back on September 15, 2016, in which he claimed that the warden and/or administrative staff had interfered with his attempts to file motions in the case; lobbied his psychiatrist to deny him his anti-psychotic medication Seroquel, after which he had a "suicidal episode;" placed him in segregation; and instituted a policy of prohibiting correctional officers from speaking to him or having any contact with him. As a result of the "no officer contact" policy, Goodvine claimed that on August 13 and again on August 16, 2016, he was unable to flag down an officer and let them know he was feeling suicidal, and on both occasions, he seriously cut himself and had to be transported to the local hospital for medical attention. At that

time, he requested an order enjoining the defendants from interfering with his mail, restoring his medication and removing the no officer contact policy. ECF No. 11.

In an order entered on October 24, 2016, Judge Clevert denied most of the relief requested but did order an evidentiary hearing on why Goodvine's medication had been stopped. ECF No. 31. Before the hearing was held, however, the court was informed that Dr. Maier, who had treated Goodvine in the past, took over Goodvine's psychiatric care and had reinstated the medication. Dr. Maier told the court that since Goodvine had been diagnosed with anti-social personality disorder, "he has been determined to engage in self-harm events to manipulate the system." ECF No. 40 at 2. Although Dr. Maier noted that in the past he had not observed that Seroquel had any positive or negative effect, he issued a new prescription for the medication because "there is no benefit to engaging in a power struggle with the plaintiff and the plaintiff reports the medication is helpful." *Id.*

Notwithstanding his efforts to obtain relief from the alleged retaliatory violations of his constitutional rights at GBCI in this case, Goodvine filed a separate lawsuit in the United States District Court for the Western District of Wisconsin on October 24, 2016, challenging the "no officer contact" restriction and the lack of effective policies and practices for treatment of inmates with serious mental illnesses. *Goodvine v. Litscher, et al*, W.D. Case No. 16-703, ECF No. 1. Goodvine alleged in that case that he had seriously injured himself on several occasions by cutting himself, including on one occasion at St. Vincent Hospital where he was taken after overdosing on medication he had been surreptitiously storing. On June 27, 2017, Goodvine filed a motion for immediate screening and for an expedited hearing on a motion for preliminary injunction in his Western District action. In a July 5, 2017 order screening the complaint in that case, Judge Conley

noted that Goodvine had filed a substantially similar case in June 2016, which the court had ordered transferred to this district where GBCI is located. That case was dismissed before the transfer occurred, however, after Goodvine failed to pay the filing fee. Judge Conley also noted that Goodvine had commenced the instant action on July 8, 2016, which was still pending. (Goodvine also has a third case pending in this district, *Goodvine v. Fond du Lac County, et al.*, Case No. 17-C-0390-NJ, in which he has asserted a similar deliberate indifference claim against the officers and staff of the Fond du Lac County Jail for failing to prevent him from injuring himself.) Although Judge Conley recognized the substantial overlap between this case and the new case Goodvine filed in the Western District both factually and legally, and the fact that both GBCI and St. Vincent Hospital were located in the Eastern District, he declined to change venue *sua sponte* since Goodvine had also sued the Secretary of the Wisconsin Department of Corrections and his deputy, both of whom resided and worked in the Western District. ECF No. 10. Judge Conley concluded Goodvine had stated claims against at least some of the defendants, ordered those defendants to respond to the complaint, and also ordered the defendants to file an expedited response to Goodvine's motion for a preliminary injunction by July 17, 2017. *Id.*

Back in the Eastern District, Judge Pepper, to whom the instant case had been reassigned, ordered the defendants to respond to Goodvine's June 2, 2017 motion for a preliminary injunction by July 28, 2017. ECF No. 69. On July 25, 2017, the day after they filed their motion to dismiss as a sanction, the defendants filed a motion to stay all discovery and deadlines in this case pending Judge Conley's decision on Goodvine's motion for a preliminary injunction in the Western District case and Judge Pepper's own decision on their motion to dismiss this case as a sanction. ECF No. 74. The defendants advised the court that Goodvine's motion for a preliminary injunction in the case

before Judge Conley sought essentially the same relief as the motion he filed in this case. They noted that it was was fully briefed and that Judge Conley had held a hearing on Goodvine's motion on July 21, 2017, and scheduled a follow-up hearing on July 26, 2017. *Id.* To avoid duplicate hearings and potentially inconsistent injunctions, the defendants asked the court to stay any further proceedings on Goodvine's motion for preliminary relief in this case, and stay all other proceedings in the case pending a decision on their motion to dismiss as a sanction. Judge Pepper granted the defendants' motion on July 27, 2017.

After a third hearing on Goodvine's motion for a preliminary injunction on August 8, 2017, Judge Conley ordered a stay and directed the parties to mediation. That mediation failed, and on September 8, 2017, Judge Conley transferred the case to this court for direct assignment to the judge sitting in Green Bay as Case No. 17-C-1223. On September 25, 2017, I conducted a telephone conference and advised the parties that I would review the record, including transcripts of the hearings before Judge Conley, with a view to either deciding Goodvine's motion for a preliminary injunction on the record as it stood or ordering an evidentiary hearing if it appeared necessary. I also directed the defendants to answer the complaint by October 6, 2017. On October 18, 2017, I entered an order denying Goodvine's motion for preliminary relief on the ground that he had failed to establish a likelihood of success on the merits. In so ruling, I noted:

> [I]t appears from Goodvine's mental health records that threats of self-harm are not so much a product of a severe mental illness as a means he uses to get his way. For example, according to a psychological services unit (PSU) report dated September 2, 2014, Goodvine went on a hunger strike at that time because he was unhappy with his treatment. *Id.* at 188. A later report indicates he had gone on hunger strikes 12 times in 2014. *Id.* at 186. In any event, when seen on September 2, 2014, he was fully oriented, calm and cooperative, with no gross cognitive or functional impairments, and no perceptual disturbances reported or observed. In short, there was no evidence of severe mental illness, but Goodvine reported that he would

7

continue his hunger strike until he died unless all of his concerns were addressed and he received the treatment he perceived to be adequate. *Id.* at 188. The psychologist who interviewed him noted that Goodvine "appears to have the capacity to make a rational choice based on his clear and coherent mental status, reported motivation for the hunger strike, and history of similar behaviors." *Id.* More recent reports note that "his self-harm behavior, gestures, and threats do not appear to be generated from instability of identity or interpersonal relationships and rather are attempts to influence others for secondary gain such as personal profit/benefit. His personality dynamics appear to be accounted for by Antisocial Personality Disorder." *Id.* at 271.

No. 17-C-1223, ECF No. 6. In light of the history recounted in his medical file, I observed that "one can reasonably wonder if Goodvine would continue to persist in such behavior if it did not garner him the kind of attention he has received and fuel his multiple federal cases against correctional staff and administration." *Id.* In any event, I concluded that the record clearly demonstrated that the defendants were not deliberately indifferent to Goodvine's serious medical needs. *Id.* at 7. That decision is currently on appeal.

As noted above, Judge Pepper transferred this case to me as well, and on October 4, 2017, I scheduled an evidentiary hearing on the defendants' motion for sanctions for January 3, 2018. I now turn to the findings of fact I have arrived at based on the evidence presented at that hearing and my conclusions of law.

## FINDINGS OF FACT

I find by clear and convincing evidence that Goodvine filed a false and fraudulent declaration with the court and that he further lied under oath at the evidentiary hearing in an attempt to avoid the consequences of his actions. I base this finding first upon the testimony of Davee McClinton, whom I found to be a credible witness. McClinton is no longer employed by the Department of Corrections for reasons unrelated to this incident and thus has nothing to gain from lying about it, particularly if, as Goodvine claims, he was so upset about the incident when it occurred that he went

8

out of his way to help Goodvine by signing a declaration supporting his allegations. McClinton testified that he did not dictate the contents of the declaration to Goodvine, and that the statements made in the declaration are in fact false. Contrary to the statement in the declaration, McClinton testified that on May 24, 2016, he was not ordered to maintain constant or direct observation of Goodvine, but was told to observe him at fifteen-minute intervals. McClinton testified that he did just that and noted his observations in the log he was required to maintain. McClinton also denied that VandeWalle or anyone else had told him to redo the observation log after Goodvine cut himself and was found bleeding. He denied even having access to the book in which the psychologist's order for placement and the level of observation required are recorded.

McClinton did admit that his signature appears on the July 4, 2016 declaration, Exhibit 1014, that Goodvine filed in this matter. As to how it got there, McClinton explained that he had been working at Green Bay Correctional for only a few weeks when Goodvine asked him to sign a blank piece of folded paper. According to McClinton, Goodvine told him that he wanted a record of each time he submitted a request for services to the psychological services unit (PSU) because he claimed the slips were being intercepted. Goodvine apparently handed McClinton a request for PSU services, and McClinton complied with Goodvine's request by signing his name on the paper Goodvine handed him. A couple of weeks later, Goodvine apparently handed McClinton another PSU request for services and asked McClinton to sign another blank piece of folded paper. McClinton explained that, after having been around for a bit longer and learning about the history of some of the inmates, Goodvine's request that he sign another blank piece of paper gave him pause. He nevertheless signed his name, but then put a forward slash after his signature and wrote "for PSU slip" or something similar. He identified this notation on the declaration, Exhibit 1014, but it had been scribbled over

and was no longer legible when Goodvine filed it with the court and it was entered electronically into the record. McClinton acknowledged that signing the blank papers for Goodvine was a mistake, but said he had believed Goodvine's representations about why he needed McClinton's signature.

McClinton's testimony was corroborated by the testimony of Captain VandeWalle, who was McClinton's supervisor on the Restrictive Housing Unit at the time. VandeWalle, whom I also found to be a credible witness, denied that he ever told McClinton to "redo" any documentation concerning Goodvine's placement on observation status. He also denied that either he or anyone else had instructed McClinton that he was to directly and constantly observe Goodvine in his cell. The original order was for observation at fifteen minute intervals.

The testimony of both McClinton and VandeWalle was further corroborated by the documentary evidence. The order signed by Dr. Forbes, who is described on the form as a "Psychological Associate," states that Goodvine was to be observed in fifteen minute intervals, not constant. Exhibit 1007 at 19. Though not actually signed until May 26, 2016, two days after the incident, Dr. Forbes' order was maintained by PSU and neither McClinton nor VandeWalle had ready access to it. The log sheet on which McClinton recorded his observations of Goodvine prior to his self-injury also supports the testimony that observation at only fifteen minute intervals was ordered. The observation log, which plaintiff asserts was redone by McClinton, has entries from other correctional officers who were on duty both before and after McClinton. Their entries were clearly written in handwriting different from McClinton's, making it unlikely that it was recreated by McClinton after-the-fact, as plaintiff asserts. Exhibit 1007 at 21.

Goodvine, of course, told a far different story. He testified that on May 24, 2016, Dr. Forbes told him he was being placed on direct observation because Goodvine would not respond to Dr.

Forbes' question whether he would be safe. Goodvine testified that McClinton was supposed to be sitting directly outside of his cell and watching him the whole time. Instead, McClinton was told to do other tasks and would leave for long periods. Goodvine testified that at one point, Vandewalle asked him if McClinton was watching him, and Goodvine told him no one was watching him. McClinton stopped in once, and Goodvine stated that he showed him a small scratch on his arm just so McClinton would take him seriously. Goodvine said he also asked McClinton to have him placed in a restraint chair so he couldn't harm himself. According to Goodvine, McClinton left again. Sometime thereafter, Goodvine testified, he used a piece of metal from a door or window frame of his cell to make a deep six-inch laceration in his arm. Goodvine testified that an inmate janitor found him bleeding with blood all over his cell, and notified the guards who then took him to the Health Services Unit for evaluation and care.

As for the declaration, Goodvine claimed that McClinton had actually signed two declarations for him. The first was on June 6, 2016, about two weeks after the May 24 incident. Goodvine testified that McClinton was working in the restricted housing unit on that day passing out medication. He approached Goodvine's cell and asked him how his arm was healing. According to Goodvine, McClinton told him that he would have watched him more closely, but he hadn't understood what direct observation meant and he had a lot of other duties to complete. Goodvine testified that McClinton told him that he had been ordered by VandeWalle to rewrite his portion of the observation log after Goodvine cut himself to make it look like Goodvine had been on fifteen-minute checks instead of constant observation to cover up the fact that they had not followed instructions. Goodvine testified that he asked McClinton if he would be willing to put that in writing

and McClinton agreed. Goodvine testified that he then wrote it out and McClinton signed it. He said he assured McClinton that he would not use it within the institution.

Goodvine testified that McClinton again approached him on July 4, 2016, and provided more information. Goodvine again asked McClinton if he would sign a declaration and McClinton agreed to do so. Goodvine testified that McClinton agreed because he told Goodvine that he did not think what had happened was right and McClinton did not feel like Green Bay Correctional suited him very well. Goodvine testified that McClinton read the declaration he prepared and signed it. Goodvine said that he (not McClinton) put the forward slash after McClinton's name. Goodvine testified he then wrote inmate Leighton Lindsey's name because Lindsey was in the cell next to him when McClinton signed the first declaration and he wanted Lindsey to sign as a witness just in case McClinton later changed his mind. Goodvine testified that he then scratched out Lindsey's name because Lindsey had been moved to a different cell and was unable to sign the declaration.

Goodvine then told a convoluted story about how he immediately mailed the first declaration to his fiancé, Maxine-Jonise D'Acquisto, along with a first draft of the complaint he filed in this case and told her to make copies, keep the original, and either file a copy with the court or show it to attorneys in an effort to secure counsel for him. Although he had previously sent her $10,000 from a settlement of one of his previous lawsuits, he testified that she didn't have enough money to make a copy. He also said she went to court to file it, but she went to the state court instead of the federal court, and the clerk would not accept it. Eventually, he claims he told her to mail it back to him, and she told him she did. Goodvine testified he never received it, causing him to suspect that prison officials who were monitoring his mail had taken it. In support of these suspicions, Goodvine pointed to an admission by Social Worker Chris Heil that she had been reading his mail, contrary to

12

a declaration by Security Director John Kind, which denied Goodvine's mail was being monitored. At one point, Goodvine seemed to testify that he asked Officer McClinton to sign the second declaration after he asked Ms. D'Acquisto to return the first one, but later testified that he asked her to send it to him as late as October 2016.

On cross-examination Goodvine was defensive and, as to some questions, evasive. He was unable to explain any significant difference in the two declarations he had McClinton sign even though the second was twice as long as the first. Goodvine also claimed that inmate Lindsey had signed an affidavit stating that he witnessed the conversation between Goodvine and McClinton on June 6, 2016. Goodvine testified he no longer had Lindsey's affidavit, however, because he believed Social Worker Heil confiscated it from his cell, as he suspected she did the first declaration from his mail. Goodvine had asked that Lindsey testify at the hearing, but his appearance was cancelled on the defendants' motion after Lindsey testified at a deposition shortly before the hearing that although he recalled being in a cell next to Goodvine in June of 2016, he had no recollection of ever signing a declaration or affidavit for Goodvine and did not even recall who Officer McClinton was. ECF No. 103-1 at 6–8.

Goodvine did call Inmate David Thomas as a witness who corroborated Goodvine's account of his meeting with Officer McClinton. Thomas testified that he was on the Restricted Housing Unit at the same time as Goodvine and overheard his discussion with McClinton about the day Goodvine cut himself. Thomas testified that he heard McClinton tell Goodvine that Goodvine was supposed to be on direct observation on May 24, 2016. According to Thomas, McClinton told Goodvine that VandeWalle ordered him to redo the observation logbook after Goodvine cut himself and McClinton thought that was wrong. Thomas said he could see McClinton writing something at Goodvine's cell.

13

Ms. D'Aquisto, Goodvine's fiancé, also testified. Goodvine asked her mostly leading questions, and her testimony seemed rehearsed, frequently adding to her answer other information that was not responsive. For less leading questions, she seemed to be searching for answers, as opposed to simply telling the truth. Ms. D'Aquisto did testify that she received a declaration signed by McClinton in the mail from Goodvine. Although Goodvine told her to make copies and show it to attorneys, she testified that she never did so because she didn't have money to make copies and her disability prevented her from going to an attorney's office, although she managed to come to Green Bay from her home in Milwaukee for the hearing. She claimed she did talk with an attorney over the phone about the declaration, but was confused by it even though she claims she read it several times. She testified she kept the declaration in the trunk of her car for safekeeping and then mailed it back to Goodvine with other letters when he asked her to do so.

I do not find the testimony of Goodvine or his two witnesses credible. Goodvine's central claim—that he was ordered to be under direct and constant observation by Officer McClinton on May 24, 2016—is belied by the Placement Order signed by Dr. Forbes which stated Goodvine was to be observed every fifteen minutes. The Placement Order was not a record maintained by the Correctional Officers in the Restrictive Housing Unit. It was maintained by the PSU. Changing one's records without a legitimate reason is a serious matter for a health care professional, such as Dr. Forbes. Moreover, if Dr. Forbes had originally ordered constant supervision, he would have had no reason to change his order after Goodvine cut himself. He could hardly have been blamed if his order was not followed. The observation log which was maintained on the Restrictive Housing Unit also shows entries in other handwriting by other correctional officers both before and after

14

McClinton's entries appear. I do not find plausible Goodvine's claim that the entire record was falsified simply because he managed to again cut himself.

Goodvine argues that McClinton's testimony should not be believed because it makes no sense for a correctional officer to have signed a blank piece of paper for an inmate. But McClinton explained why he signed the paper at Goodvine's request. I find it far more plausible that as a relatively new, young correctional officer, McClinton was too trusting and sadly naive than that he lied in court under oath for no apparent reason not only about the events of May 24, 2016, but also about how his signature ended up on the July 4, 2016 declaration. I am also convinced that if McClinton wanted to "come clean" about the events of May 24th and help Goodvine establish the truth, as Goodvine claims, McClinton would have written out the contents of the declaration on his own time, passed it on to Goodvine when he came to work, and then openly acknowledged what he had seen and done when, no longer employed by the Department of Corrections, he was questioned about it.

In any event, McClinton was not so naive as to simply sign his name on a blank piece of folded paper the second time Goodvine asked him to do so. On the second occasion he added the notation acknowledging that Goodvine had given him a PSU slip. Goodvine's claim that he, and not McClinton, made this notation, which was actually Inmate Lindsey's name, because Goodvine planned to have Inmate Lindsey sign as a witness is not credible. Why would Goodvine plan for Inmate Lindsey to sign as a witness when he was no longer on the unit and able to witness the event? Likewise incredible is Goodvine's claim that Lindsey had signed an earlier affidavit corroborating Goodvine's story about the June 6, 2016 declaration. Had Lindsey witnessed such an occurrence

15

and signed such an affidavit, he most certainly would have recalled it. Yet, Lindsey denied any recollection of the events and even of McClinton in his testimony.

Goodvine's attempt to corroborate his version of event's with Inmate Thomas was similarly unconvincing. Thomas testified he was in Cell 405 and Goodvine was in Cell 401 of the Restrictive Housing Unit, one or two cells away, when he supposedly overheard then Officer McClinton's conversation at Goodvine's cell about the events of May 24 and the alleged "cover-up." Having heard McClinton speak, however, I find Inmate Thomas' testimony incredible. To characterize McClinton as soft-spoken would be an understatement. Despite testifying in a quiet courtroom with a microphone, the Court had to instruct him multiple times to speak up because it was very difficult to hear him. The restricted housing unit at Green Bay Correctional is not a quiet place; the Court does not believe that Thomas could have overheard anything McClinton said to Goodvine, especially if, as Goodvine testified, McClinton was nervous about conveying the information to Goodvine. It is absurd to suggest that, in those circumstances, McClinton would have been speaking so loudly that other inmates on the unit, and perhaps other correctional officers as well, could overhear him. Unlike Inmate Lindsey, I conclude that Inmate Thomas was willing to assist Goodvine in his attempted fraud.

Ms. D'Aquisto's incoherent attempt to corroborate Goodvine's story is also unavailing. Essentially, her testimony was only about the first declaration, the one Goodvine claimed McClinton signed on June 6, 2016, and which has since disappeared. About the July 4, 2016 declaration that was the basis of the defendants' motion, Ms. D'Aquisto, by her own admission, knew nothing. Even if we believe her testimony about receiving the June 6, 2016 declaration from Goodvine in the mail, that just explains what happened to the first blank piece of folded paper that McClinton testified he

signed for Goodvine. It does not make Goodvine's story any more believable. In fact, it means Goodvine manufactured two false pieces of evidence instead of one.

Finally, I note that Goodvine has a strong motive both to manufacture evidence in support of his claim and to lie about it. Goodvine admitted in the course of his testimony that he has successfully sued jail and/or correctional officers on a number of previous occasions for failing to prevent him from harming himself and related claims, and has recovered at least $25,000 in settlements with the State. In fact, he could not recall either the total number of lawsuits he had brought or the total amount of money he had been paid based on claims of deliberate indifference to his self-harming behavior. Although he attributes his self-harming behavior to a mental disorder over which he lacks control, he did not appear to suffer any serious mental illness in the course of the hearing. During the more than three hour hearing before me, Goodvine appeared entirely rational, coherent, and completely in control of his faculties. His many filings in the two cases over which I have presided reflect similar qualities of mind and functional capacity. Instead, Goodvine appears to have found a way to both manipulate the officers and staff of the correctional institutions where he has been held, while at the same time obtaining substantial pay-outs from the State which, confronted with the high cost of defending numerous federal lawsuits by state prisoners, often aided by court-recruited counsel, and the uncertainty of the eventual outcome of the case, often concludes that payment of significant amounts in settlement makes economic sense.

For all of these reasons and based upon the evidence presented at the evidentiary hearing, I find that Goodvine manufactured false and fraudulent evidence in the form of a declaration purportedly signed by a correctional officer and filed it with the court in an attempt to defraud both

the court and the defendants. I also find that he lied about the fabricated evidence under oath and induced another inmate to join in his lie. I now turn to the question of an appropriate remedy.

## REMEDY

"A litigant's misconduct can justify default judgment, *see National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976), and perjury is among the worst kinds of misconduct." *Rivera v. Drake*, 767 F.3d 685, 686 (7th Cir. 2014). The Court has the inherent power to sanction a party's misconduct. *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 739 (7th Cir. 2009). "Sanctions meted out pursuant to the court's inherent power are appropriate where the offender has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Id.* Further, Fed. R. Civ. Pro. 11(c) empowers courts to sanction a party who files a pleading or other paper for an improper purpose such as to harass. As explained above, I have found that Goodvine maliciously fabricated allegations and evidence. As such, although dismissal with prejudice is an extreme sanction, the Court finds it is warranted in this case.

Manufacturing evidence and lying under oath undermine the essential truth-finding function of our system of justice. It also puts the judicial system through unnecessary work and causes the defendants unnecessary expense and delay. *Rivera*, 767 F.3d at 686. Given the amount of money the State has paid Goodvine on his past claims, I considered allowing him to avoid dismissal by paying the State the attorneys fees and costs necessitated by his fabricated evidence and lies. I conclude, however, that this would not serve the interests of justice and would fail to send an important message to other prisoners who may be tempted to engage in similar behavior. Given the magnitude of Goodvine's offense, dismissal of this action is the least that should occur.

I have also considered the nature and merits of Goodvine's claim. I have previously noted the development of the unique rule of law upon which Goodvine's case is predicated. *See Taylor v. Wausau Underwriters Ins. Co.*, 423 F. Supp. 2d 882 (E.D. Wis. 2006). The rule has its source in the recognition by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97 (1976), of an Eighth Amendment claim against prison officials who deliberately fail to protect an inmate against serious threats to the inmate's safety from which, because of his incarceration, the inmate cannot protect himself. Over the years, however, that principle appears to have evolved into the rule that guards must now protect an inmate from the inmate's own efforts to injure himself, even in the absence of evidence of a severe mental illness that has robbed the inmate of his faculties. *Id.* at 889–90. At least that is what the Seventh Circuit has held, albeit in *dicta*. *See Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006) (noting that reckless indifference to the risk of "perfectly sane" prisoner's committing suicide is a standard basis for a federal civil rights suit).

As this and other cases demonstrate, the obligation to protect inmates like Goodvine who frequently proclaim their intent to harm themselves places a heavy burden on prisons and their staff who then must take action in order to avoid a claim that they were deliberately indifferent to the inmate's welfare. In *Bowers v. Pollard*, I compared it to a hostage situation where the same person is both the hostage and the hostage taker:

> Bowers insisted that the prison staff accede to his demands—a transfer, a change of cells, a longer period for writing, the return of property, etc.—or he would harm himself. Obviously, prison officials cannot negotiate with an inmate concerning such matters and allow him that kind of power and control. Yet, the prison staff was unable to rescue the hostage. Because the threatened hostage was the same person as the threatening perpetrator, they could not be separated. It was impossible to deny the perpetrator access to his hostage. The defendants were left with the almost impossible task of trying to protect a man from himself twenty-four hours a day and seven days a week. Their efforts to do so, even if at times mistaken and perhaps even

> counter-productive, reflect not indifference but tremendous concern for Bowers' care and safety, far more than he had for himself. It is difficult to imagine any institution on earth, penal or not, that could or would be expected to expend as much time, effort and resources to protect a person from himself. Indeed, it is the prison staff's very concern for Bowers' physical safety that, in his mind, gave him so much power over them.

602 F. Supp. 2d 977, 993 (E.D. Wis. 2009).

The rule holding guards responsible for self-harm by legally sane inmates who make such pronouncements also creates a perverse financial incentive for inmates such as Goodvine to cause serious injury to themselves. As I noted in denying Goodvine's motion for a preliminary injunction in his other case, "one can reasonably wonder if Goodvine would continue to persist in such behavior if it did not garner him the kind of attention he has received and fuel his multiple federal cases against correctional staff and administration." No. 17-C-1223, ECF No. 6. It appears his current psychiatrist believes it would not. ECF No. 40 at 2. If that is true, then dismissing this and similar claims Goodvine asserts may be a benefit to him and do more to curb his self-mutilation than allowing his case to continue.

There is also the question of whether it is just to impose civil liability on prison staff, and ultimately State taxpayers, for their failing to prevent inmates like Goodvine from harming themselves. Of course, the plaintiff in such a case must show deliberate indifference on the part of the guards in order to recover. But once a prisoner announces his intent to harm himself, the burden then shifts to the institution as a practical matter to take all reasonable steps to prevent the inmate from following through on his stated intent. As Goodvine explained at the hearing, it is relatively easy to find ways of injuring oneself in an old institution like GBCI. He testified that he could usually find an old piece of metal from a door or window frame or a piece of concrete that he could

break off and use to cut himself. It appears he has simply been playing a game of cat and mouse with the guards, except that instead of the cat having to catch the mouse, the cat's job is to prevent the mouse from injuring itself, a much more difficult and labor intensive task. Apparently, prison officials have eshewed straightjackets and padded cells as methods of dealing with such inmates, presumably out of concern that their use would subject them to claims of cruel and unusual punishment. Indeed, one of Goodvine's claims in this case is that, when they returned him to his cell after he cut himself, the defendants inflicted cruel and unusual punishment on him by placing him on a bed in eight-point restraints. ECF No. 1, ¶¶ 30–32.

To be sure, no one is suggesting that prison guards should just stand by while a prisoner, mentally ill or not, attempts to seriously injure or kill himself. There are practical, *Freeman*, 441 F.3d at 547, as well as strong moral reasons, for preventing such behavior. But imposing civil liability on the guards who fail to prevent a legally sane prisoner from deliberately harming himself runs counter to the understanding of human nature on which our law is based. *Taylor*, 423 F. Supp. 2d at 888 ("The law assumes that, absent serious mental illness or other form of incapacity, a person has free will and is therefore responsible for his own intentional acts."); *see also Morissette v. United States*, 342 U.S. 246, 250–51 (1952) (noting that mature legal systems envision "belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.").

Regardless of whether such a rule is ever just and reasonable, however, it makes no sense to apply it in a case like this where a manipulative inmate has fabricated evidence in an effort to subvert justice and defraud the defendants. Goodvine's actions demonstrate that he has no respect

for the integrity of the judicial process. The court will not allow him to trample on that integrity any further. The only reasonable sanction for such egregious misconduct is dismissal with prejudice.

Finally, sections 1915(e)(2) and 1915A require the Court to dismiss a complaint at any time if it determines that the complaint is malicious. 28 U.S.C. §§ 1915(e)(2), 1915A. It is hard for the Court to conceive of misconduct more malicious than fabricating allegations and evidence. Goodvine has manufactured evidence to defraud the Court, the defendants, and ultimately, the taxpayers of the State of Wisconsin. His fraudulent behavior has resulted in the court diverting significant time and resources from legitimate cases. In addition, his misconduct has introduced stress and anxiety into the lives of people who did nothing more than try to perform their duty to care for him. As such, the Court finds that Goodvine must also be assessed a strike under 28 U.S.C. § 1915(g). *See Lindsey v. Brown*, Case No. 13-cv-68, 2013 WL 5148347, at *2 (S.D. Ind. Sept. 11, 2013).

## CONCLUSION

Accordingly and for the reasons set forth above, the defendants' motion to dismiss as a sanction (ECF No. 70) is **GRANTED**. Goodvine's motion for a preliminary injunction (ECF No. 67) is denied for the reasons set forth in the court's October 18, 2017 order denying his similar motion in Case No. 17-C-1223 and as moot. Goodvine is assessed a strike under 28 U.S.C. § 1915(g). The Clerk is directed to enter judgment of dismissal forthwith. Finally, a copy of this decision will be sent to the United States Attorney, who may wish to prosecute Goodvine for the crime of perjury. *See Rivera*, 767 F.3d at 687 (citing 18 U.S.C. § 1621).

**SO ORDERED** at Green Bay, Wisconsin this <u>17th</u> day of January, 2018.

/s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

22

This order and the judgment to follow are final. The plaintiff may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A). If the plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If the plaintiff seeks leave to proceed in forma pauperis on appeal, he must file a motion for leave to proceed in forma pauperis with this court. See Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. See 28 U.S.C. § 1915(g). If the plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The court cannot extend these deadlines. See Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.